UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

     Plaintiff,

v.

Robert James Jefferson,

     Defendant.

**MEMORANDUM OF LAW & ORDER**
Criminal No. 97-276 (04) (MJD)

_____

Jeffrey S. Paulsen, Assistant United States Attorney, Counsel for Plaintiff.

Mark D. Larsen, Lindquist & Vennum LLP, Counsel for Defendant.

_____

This matter is before the Court for resentencing.

I. **Background**

Defendant Robert James Jefferson was charged in eleven counts of a sixty-two count Third Superseding Indictment that was filed on May 12, 1998. The most serious of the charges involved conspiracy to murder, and the murder of five young children and conspiracy to possess and distribute cocaine and cocaine base. He was also charged with attempted murder and assault. He was sixteen years old at the time the murders were committed.

On August 5, 1998, a jury returned a verdict of guilty against Jefferson on all counts, except one count involving a specific drug transaction.  At sentencing, the applicable guideline range was determined to be life in prison based on a total offense level 43 and a criminal history category I.  Jefferson was thereafter sentenced to term of life imprisonment on counts 51 through 55, 120 months on count 2, 48 months on counts 29 and 32, 120 months on counts 50, 56 and 57 and 240 months on count 58, all to be served concurrently.  Jefferson's conviction and sentence were affirmed on appeal.  United States v. Jefferson et al., 215 F.3d 820 (8th Cir. 2000), cert. denied, 531 U.S. 911 (2000).

In a recent decision, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."  Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012).  The Court found that such a sentence was unconstitutional because such mandatory sentencing schemes did not allow the sentencing court to consider that children are constitutionally different from adults for purposes of sentencing.

When Jefferson was originally sentenced in 1998, the sentencing guidelines were mandatory.  Under Miller, a mandatory sentence of life in prison without

parole would now be deemed unconstitutional.  Although the Supreme Court

did not specifically hold that the <u>Miller</u> decision applied retroactively on

collateral review, the government in this case did not oppose Jefferson's habeas

petition asking that he be resentenced in light of the <u>Miller</u> decision.  The Court

thus granted the petition and set the matter for resentencing in light of <u>Miller</u>.

## II.   <u>Miller v. Alabama</u>

At issue in <u>Miller</u> were two underlying criminal cases involving 14 year old

defendants.  In the first case, the defendant had participated in an armed robbery

of a video store.  On the way to the store, the defendant had learned that one of

his two co-defendants was carrying a sawed-off shotgun, prompting the

defendant to stay outside the store during the robbery.  During the robbery, the

co-defendant with the gun was pointing it at the store clerk, who refused to give

robbers the money.  At some point, the defendant entered the store.  At trial, the

parties disputed whether the defendant warned the clerk that "we ain't playin'"

or that he told his co-defendants "I thought you all was playin'."  When the clerk

threatened to call the police, the co-defendant shot and killed her.

The other case also involved a 14 year old defendant who had been in and

out of foster homes because his mother was an alcoholic and drug addict and his

stepfather abused him.  The defendant also regularly used drugs and alcohol and

had attempted suicide four times.  The crime at issue involved the defendant and

a friend.  One night, a neighbor came to the defendant's home to make a drug

deal with the defendant's mother.  The two boys then followed the neighbor back

to his home, where they smoked marijuana and played drinking games.  After

the neighbor passed out, the defendant took out the neighbor's wallet and stole

$300.  When the defendant tried to put the wallet back in the neighbor's pocket,

he woke up and grabbed the defendant by the throat.  The friend hit the neighbor

with a nearby baseball bat.  Thereafter, the defendant grabbed the bat and

repeatedly struck the neighbor with the bat.  At one point, the defendant put a

sheet over the neighbor's head and told him "I am God, I've come to take your

life."  The boys left, but later returned to cover up evidence of their crime by

lighting two fires.  The neighbor died from his injuries and smoke inhalation.

Both defendants were sentenced to life imprisonment without parole based

on state law that mandated such sentences for the crimes of conviction.  The

defendants challenged the sentences as a violation of the Eighth Amendment.

The Court began its analysis by recognizing that the Eighth Amendment

guarantees that punishment for a crime must be graduated and proportioned to

4

both the offender and the offense.  Miller, 132 S. Ct. at 2463.  The Court then

recognized that the issue before it - whether a defendant that was convicted of

murder as a juvenile may be subjected to a mandatory life sentence without

parole -  implicated two strands of precedent concerning proportionate

punishment: the first involving categorical bans on sentences based on

mismatches between the culpability of a class of offenders and the severity of the

penalty, such as the imposition of the death penalty for nonhomicide crimes or

on mentally retarded defendants; and the second involving the prohibition of the

mandatory imposition of capital punishment on juvenile offenders, as such a

sentencing scheme did not allow the sentencing court to consider the

characteristics of the juvenile or the details of his offense.  Id. 132 S. Ct. at 2463

(citing cases, including Roper v. Simmons, 543 U.S. 551 (2005) (holding that

imposition of the death penalty on juvenile offenders for first degree murder

violates Eighth Amendment); Graham v. Florida, 560 U.S. 48 (2011) (finding that

Eighth Amendment prohibits imposition of life without parole sentence on

juvenile offender who did not commit homicide); Woodson v. North Carolina,

428 U.S. 280 (1976) (finding mandatory death sentence for first degree murder

conviction violated Eighth Amendment)).  The Court then recognized that "the

confluence of these two lines of precedent leads to the conclusion that mandatory

life-without parole-sentences for juveniles violate the Eighth Amendment."

With respect to the first line of precedent, the Court recognized that

"children are constitutionally different from adults for purposes of sentencing.

Because juveniles have diminished culpability and greater prospects for reform,

we explained 'they are less deserving of the most severe punishments.'" Miller,

132 S. Ct. at 2464 (citations omitted).  The Court also recognized that children

"lack [] maturity and [have] an underdeveloped sense of responsibility, leading

to recklessness, impulsivity, and heedless risk-taking." Id.  The Court also noted

that children are more susceptible to peer pressure and have a limited control

over their own environment.  Id.  Finally, the Court recognized that a child's

character is not well-formed and his "actions less likely to be evidence of

irretrievable depravity." Id.  Because of these attributes, the Court held that "the

penological justifications for imposing the harshest sentence" on juveniles are

diminished, "even when they commit terrible crimes." Id. at 2465.

Mandatory sentences of life without parole for juvenile offenders,

however, prevent the sentencing court from considering a juvenile's lack of

maturity or his susceptibility to peer pressure.  Id. at 2466.  "By removing youth

from the balance - by subjecting a juvenile to the same life-without parole

sentence applicable to an adult - these laws prohibit a sentencing authority from

assessing whether the law's harshest term of imprisonment proportionately

punishes juvenile offender."

> To recap: Mandatory life without parole for a juvenile precludes
> consideration of his chronological age and its hallmark features—among
> them, immaturity, impetuosity, and failure to appreciate risks and
> consequences.  It prevents taking into account the family and home
> environment that surrounds him—and from which he cannot usually
> extricate himself—no matter how brutal or dysfunctional.  It neglects the
> circumstances of the homicide offense, including the extent of his
> participation in the conduct and the way familial and peer pressures may
> have affected him.  Indeed, it ignores that he might have been charged and
> convicted of a lesser offense if not for incompetencies associated with
> youth—for example, his inability to deal with police officers or prosecutors
> (including on a plea agreement) or his incapacity to assist his own
> attorneys.  And finally, this mandatory punishment disregards the
> possibility of rehabilitation even when the circumstances most suggest it.

Miller 132 S. Ct. at 2468.[1]

## III.   Application of Miller Factors

### A.   Circumstances of the Homicide Offenses

---

[1]In addition to the opinion in Miller, the Court found the Amici Curiae brief of the American Medical Association and the American Academy of Child and Adolescent Psychiatry, 2012 WL 121237, and the Amici Curiae brief of the American Psychological Association, American Psychiatric Association and the National Association of Social Workers, 2012 WL 174239 to be excellent resources in preparing for this resentencing, and would recommend that a court that is resentencing a defendant in light of Miller consult these references.

The evidence at trial demonstrated that Jefferson was a member of an extremely violent gang, the 6-0-Tres; a gang that was involved in the distribution of drugs such as cocaine and crack cocaine, and numerous acts of violence, including murder, drive-by shootings during which innocent people were shot, retaliation beatings and retaliation shootings.  The 6-0-Tres had strict rules.  One rule was the code of silence, and as demonstrated at trial, one who violated this code was subject to violent retaliation.

The 6-0-Tres gang was formed in 1992 by the Jefferson's half brother Robert George "Buster" Jefferson, Frankie Adams and Antoine Brown because they believed the Rolling 60's gang was not violent enough.  The defendant herein, Robert James Jefferson, joined the gang in 1993, and only a few short months later, he found himself participating in violent gang activity.

In February 1994, Buster Jefferson ordered Lon Brown to be killed because Brown had pulled a gun on a 6-0-Tres gang member.  A short time later, Jefferson was at a party where Lon Brown was killed when he was shot twelve times in the back by 6-0-Tres member Tyrone Hill, who was sixteen years of age at the time. After Brown's murder, members of the 6-0-Tres believed that a fellow member, Andre Coppage, had provided information to the police about the murder.  In

response, Buster Jefferson ordered members of the 6-0-Tres to brutally assault Andre Coppage.

The assault of Coppage took place in the home of Willie Hart, in the presence of Hart's mother, Barbara Brown.  The first to throw a punch was the defendant, Duddy Jefferson.  During the beating, Willie Hart, who was 13 years of age at the time, pulled out a gun and placed it against Andre Coppage's head and threatened to shoot him.  Buster Jefferson, however, ordered Hart not to shoot him.  Also during the beating, Andre Coppage was forced to tell Buster Jefferson his home address.

Because Andre Coppage could still testify against Tyrone Hill, Buster Jefferson decided that Coppage had to be further retaliated against.  Again, Willie Hart volunteered to shoot Andre Coppage as a means to join the 6-0-Tres gang, but that idea was nixed by Buster because at that time, there was an additional police presence in the neighborhood because of numerous shootings.  Buster then concocted the plan to fire bomb the Coppage home.  The molotov cocktails were made at Willie Hart's house by Buster and Duddy Jefferson.  Buster told Duddy and Willie and a possible third juvenile that they were to fire bomb the house because they were juveniles and would not be punished severely.

9

On the evening of February 28, 1994, the Coppage home was set on fire, and the five young siblings of Andre Coppage; Nicheba, age 11, Nikia, age 8, Nicos, age 7, Niarte, age 4, and Myeka, age 2, were unable to escape the fire and were horrifically incinerated.  Andre Coppage was able to escape.

For Jefferson, the violence did not stop with the Coppage murders.  About one year later, Jefferson was involved in a shooting that took place following Buster Jefferson's order for a hit on a man named Cedric Manning, because Manning owed him money for drugs.  The evidence at trial showed that Jefferson and Leonard Young, while driving around, saw Manning and pulled up next to him.  Words were exchanged, and they drove off.  Jefferson decided to turn around, however, and when they again pulled up to Manning, Jefferson told Young to shoot him.  Shots were then fired.  Not only was Manning wounded, but an innocent bystander, Robert Otto, was shot in the head.  This shooting spree took place near the J.J. Hill School in St. Paul.

Jefferson was charged with the assault of Andre Coppage and he went to trial in juvenile court in 1994.  He concocted a false alibi, aided by a member of the 6-0-Tres gang who testified that he and Jefferson were not at the home when Andre Coppage was beaten.  Jefferson was convicted of the assault.

Jefferson was interviewed by Sergeant Mortenson on March 4, 1994 following his arrest at the home of Willie Hart.  Jefferson lied to the Sergeant three times.  The first lie he told is that he had never been in the white Camaro - the car used the night of the Coppage arson - yet his fingerprints were found in that car.  The second lie he told is that he didn't know Andre Coppage - even though Coppage was a fellow member of the 6-0-Tres gang.  The third lie he told is that the night of the fire, he was at home the entire night.  However, his mother testified that he came home sometime after 9 o'clock that night.  The arson was set at approximately 9 p.m.  In 1998, Jefferson continued to deny his involvement in the firebombing during the evaluation by psychologist, Dr. Alsdurf, and he was extremely arrogant and flippant about the killings.

To this day, Jefferson continues to deny his involvement in the fire bombing.  However, a jury found beyond a reasonable doubt that he had committed the crime.  Evidence was submitted at trial that demonstrated that Jefferson assisted in the preparation of molotov cocktails, and assisted in setting the Coppage home on fire.

One of the government's witnesses, Ajani Brown, testified that about three hours after the fire, he was at the home of Willie Hart to buy drugs.  While at the

house, Brown testified that he saw Hart and Jefferson enter the home.  Brown

also testified that he overheard Hart, Jefferson and others talk about the fire and

that they - referring to Jefferson and Hart - had killed some kids.  Brown further

testified that upon learning that kids were killed in the fire, Jefferson stated "fuck

em, they're dead now."

Another government witness was Frank Adams, one of the founding

member of the 6-0-Tres gang, and he testified that after the indictments in this

case, he was in jail with Jefferson.  Adams testified about a conversation he had

with the Jefferson in jail.  On this particular day, Jefferson was upset about the

news that Hart had entered into a plea agreement and may be cooperating with

law enforcement.  Jefferson explained that he was upset because Jefferson, along

with Hart, had prepared the molotov cocktails used to set fire to the Coppage

home, and that Jefferson had helped to set fire to the house.  He was clearly

concerned that Hart would implicate him for the fire bombing.

### B.    Reckless/Impulsive Behavior

Another factor the courts are directed to consider when sentencing a

juvenile is whether the crimes of conviction involved reckless or impulsive

behavior due to a lack of maturity.  While the criminal conduct at issue here is

certainly reckless, the Court finds that such criminal conduct did not involve rash or impulsive behavior.  The fire bombing of the Coppage home involved planning, the creation of molotov cocktails and then waiting until dark to set the house on fire.  Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire.  He had plenty of time to back out of the plan, but he did not do so.

In determining whether the criminal conduct at issue was reckless or impulsive, the Court also considers the context surrounding the fire bombing of the Coppage home.  Here, before the Coppage children were killed, Jefferson had already been exposed to extreme violence - the murder of Lon Brown and the assault of Andre Coppage.

Following the Coppage murders, Jefferson continued to participate in violent acts that were planned.  For example, with respect to the shooting of Cedric Manning and Robert Otto, the evidence at trial demonstrated that after Jefferson and his companions tried to collect money from Manning, and were unsuccessful, they drove away.  Jefferson was driving the car and he could have kept driving away, but he didn't.  Instead, he made the decision to turn the car around, go back after Manning, and then tell Leonard Young to shoot him.

The Court thus findings that because the murders of the five Coppage children were not the result of impulsive or rash behavior on the part of Jefferson, this factor weighs in favor of a harsh sentence.

### C.      Peer Pressure

Another factor the Court must consider is whether Jefferson acted due to peer pressure.  Research shows that typically, adolescents are vulnerable to peer pressure, and that adolescents are therefore more likely to take risks when in the presence of peers.  In fact, risk-taking in the presence of peers has been identified as "one of the hallmarks of adolescent risk-taking." Albert Chein, et al., <u>Peers Increase Adolescent Risk Taking by Enhancing Activity in the Brain's Reward Circuitry,</u> 14:2 Developmental Sci. F1, F1 (2011).   Increased risk-taking in the presence of peers is also associated with greater neural activity in the areas of the brain associated with reward processing.  <u>Id.</u>  In addition, studies show that youth may gravitate toward the protection a gang offers in areas where gangs are prevalent.  Emma Alleyne & Jane Wood, <u>Gang Involvement: Psychological and Behavioral Characteristics of Gang Members Peripheral Youth, and Nongang Youth,</u> 36 AGGRESSIVE BEHAV. 423, 424 (2010).

In the context of this case, engaging in the acts of murder or attempted

murder gave that gang member "status."  In other words, rewarding the gang

member for committing a violent act.  At the same time, the pressure to conform

to the codes of the 6-0-Tres gang would have been great as well, given the

consequences of a perceived violation of such codes.  See Id. ("gangs [] exert[]

two types of social power that attract youth: coercive power - the threat or actual

use of force and violence; and the power to pay, buy, impress and to delegate

status and rank to its members.").

   At trial, the government proved that the 6-0-Tres gang was formed with an

emphasis on violence.  In fact, Buster Jefferson and others broke from the Rolling

60's gang because it was not violent enough.  After the 6-0-Tres gang was formed,

Buster Jefferson created some rules, including the retaliation rule and the code of

silence.  Buster Jefferson also dictated that the juvenile gang members carry out

the violent acts, as juveniles, if caught, would not face as harsh a penalty as an

adult.  This method was proved repeatedly at trial starting with the murder of

Lon Brown, committed by sixteen year old Tyrone Hill, followed by the fire

bombing of the Coppage home, committed by thirteen year old Willie Hart and

Buster's sixteen year old half- brother, the defendant herein, Robert James

Jefferson.

When Jefferson was evaluated by Dr. Alsdurf in 1998, he told Dr. Alsdurf that "the dynamics within the gang would have not have lead to anyone carrying out murder simply to satisfy Buster Jefferson."  He further characterized Buster Jefferson as "bad" but claimed that he was not afraid of Buster.  Despite these statements to Dr. Alsdurf, the evidence at trial demonstrated that Jefferson had reason to be afraid of Buster Jefferson.  At his resentencing, Jefferson even admitted that if he did not do as Buster ordered, or if he broke the code of silence, he knew what would happen - he would be retaliated against by Buster Jefferson or any member of the gang.

In addition to the threats of violent retaliation, and the "status" rewards if his orders were carried out, the 6-0-Tres gang had a "family" atmosphere because many members were related by blood.  For example, Buster Jefferson and this defendant are half brothers, and Willie Hart is their cousin[2].  Two other half brothers were also members.  As a result, the gang members were fiercely loyal to Buster Jefferson and to each other.  As argued by the government at trial, it was because of all of these elements that the gang was able to carry out its crimes

---

[2]Being a blood relative did not immunize one from Buster's retaliation, however, as demonstrated by the fact that Buster shot Willie Hart three times for violating the gang's rules.

for a long period of time.

Given these facts, and the context in which Jefferson's crimes of conviction took place, the Court finds that peer pressure played a part in Jefferson's decision to participate in the firebombing of the Coppage home.  Thus, this factor weighs in favor of a sentence less than life in prison.

### D.     Home Environment

Another factor the Court must consider is whether Jefferson was the product of a bad home environment.  Jefferson initially described growing up in a stable home, and that he had a good relationship with his parents, who were ministers in the Jehovah's Witness faith.  Later, in preparation for this resentencing, Jefferson described living in a bad neighborhood.  He also revealed during a psychological evaluation conducted by Dr. James Alsdurf, Ph.D. in 2014 that he had been sexually molested by his older half-brother, Anthony, beginning when he was 9 or 10 years old.  Jefferson also told Dr. Alsdurf that other than the abuse, his home life wasn't bad, but that he wished he had stood up to Anthony.

Studies show that a bad home environment, or living in a bad neighborhood "are major risk factors for juvenile crime, including homicide."  Alan Kazdin, <u>Adolescent Development, Mental Disorders, and Decision Making</u>

of Delinquent Youths, in Youth on Trial: A Developmental Perspective on

Juvenile Justice 33 (Thomas Grisso & Robert G. Schwartz eds., 2000) at 47-48.  The

Court finds that this factor weighs in favor of a sentence other than life in prison.

**E.     Rehabilitation**

Another factor addressed in Miller is that of a juvenile's ability to reform or

be amenable to rehabilitation.  Jefferson asserts that his spotless disciplinary

record while in prison, his positive work record and the programs that he has

participated in demonstrates that he has been rehabilitated.

The government asks the Court to give this factor little weight, as Jefferson

had succeeded in treatment programs before, only to resume criminal activity

shortly after those programs were completed.  However, Jefferson participated in

those prior treatment programs when he was still an adolescent or a young adult,

and the programs were brief in time as compared to his current incarceration.

Thus, the lack of success in the prior treatment programs should not take away

from the extraordinary success he has experienced in the sixteen plus years he

has served in the federal prison system.

Accordingly, this factor clearly weighs in favor of a finding that Jefferson is

amenable to rehabilitation and would support a sentence other than life in

prison.

Having considered the factors listed in the <u>Miller</u> decision, the Court must now consider the sentencing factors set forth in 18 U.S.C. § 3553(a).

## III.    SECTION 3553 FACTORS

Pursuant to the Supreme Court decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory.  This Court is nonetheless required to take into account the applicable Guideline range and the pertinent Sentencing Commission policy statements.

In addition, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a), including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed--

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

19

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available; and

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The Court hereby commits the Defendant, Robert James Jefferson, to the custody of the Bureau of Prisons for a period of 600 months (50 years).  This term consists of 120 months on Count 2, 48 months on Counts 29 and 32, 120 months on Counts 50, 56 and 57, 600 months on Counts 51 through 55; and 240 months on Count 58.  All counts shall be served concurrent to each other.  Following this term of imprisonment, Jefferson is sentenced to a term of supervised release of five years.

Although the applicable guideline range calls for a sentence of life in prison, the Court finds that a downward variance to a sentence of fifty years is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth above.

## A.     Nature and Circumstances of the Offense

Jefferson was convicted of several violent felonies - the most serious of

20

which resulted in the horrific deaths of five young, innocent children.  In

addition, Jefferson was involved in other serious felony offenses including the

attempted murder of Cedric Manning, the shooting of Robert Otto and the

distribution of vast amounts of controlled substances.  Jefferson was actively

involved in all aspects of the gang's criminal activity.  The crimes of conviction

thus warrant a lengthy sentence.

### B.    History and Characteristics of the Jefferson

Despite the fact that Jefferson initially reported that he was raised in a

stable home and had parents that were always supportive of him, there is now

evidence that he may have been the victim of sexual abuse, and that he lived in a

bad neighborhood.  Difficult family and neighborhood conditions are major risk

factors for juvenile crime, including homicide.  In addition, because Jefferson was

only sixteen when the Coppage children were killed, he would have been

vulnerable to peer pressure.  In this case, Jefferson was subjected to the added

pressures of being a member of a violent gang, that rewarded members for

violent acts and retaliated against them for violating rules.  The Court thus finds

that the history and characteristics of Jefferson supports a downward variance

from the applicable guideline range of life in prison.

### C.      To Reflect the Seriousness of the Offense/Promote Respect for the Law and Provide Just Punishment

Murder, attempted murder, assault and drug distribution are the most serious offenses that bring a defendant before the Court.  A lengthy sentence is warranted to reflect the nature of the offenses of conviction, to promote respect for the law and to provide just punishment.

### D.      To Afford Adequate Deterrence and to Protect the Public

Jefferson has not accepted full responsibility for his actions.  He continues to deny involvement in the deaths of five children, and downplays his role with respect to the other offenses for which he was convicted.  However, Jefferson has demonstrated that he is amenable to rehabilitation.

In the time that he has been in prison, approximately sixteen and one-half years, Jefferson has no disciplinary history.  In addition, Jefferson completed 24 courses of study, including college-level courses such as logic, ethics and ancient philosophy.  He has been continuously employed in prison, working in food service, sanitation and as a medical orderly.  In addition, Jefferson convenes a weekly session of Bible study.  Prison staff have commented that Jefferson serves as a positive role model for other inmates in the Life Style Intervention Class.

Accordingly, a sentence of fifty years will afford adequate deterrence and will protect the public from further crimes of this defendant.

### E.    To Avoid Unwarranted Sentencing Disparities

Jefferson has been convicted of five counts of murder for the deaths of the Coppage children.  There is no question that a harsh sentence is warranted for the crimes of conviction in this case, but a life sentence without the possibility of release is not necessary to avoid unwarranted sentencing disparities with respect to this defendant.  See, e.g., United States v. Branden Pete Crim. No. 03-355 (D. Ariz. 2014) (life sentence for juvenile defendant convicted of murder reduced to 708 months in light of Miller); United States v. Donnie Bryant, Crim. No. 06-234 (D. Nev. 2014) (life sentence reduced to two 40 year terms, to run consecutively in light of Miller); United States v. Masontae Hickman, Crim. No. 1:96-54 (E.D. Tex. 2014) (life sentenced reduced to 40 years based on parties' sentencing agreement); United States v. Robert Lawrence, Crim. No. 5:92-35 (N.D.N.Y. 2014) (life sentenced reduced to 377 months); United States v. Angel Alejandro, Crim. No. 7:98-290 (S.D.N.Y. 2014) (life sentence reduced to 300 months).


Date:    February 4, 2015

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court